**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 14, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JEROLD R. SORENSEN,

    Defendant - Appellant.

No. 14-1366

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:13-CR-00477-RM-1)**
_____

Sean Connelly, Reilly Pozner, LLP, Denver, Colorado; (Ashley Blair Arnett and Michael Louis Minns, Michael Louis Minns, PLC, Houston, Texas, with him on the briefs), (Gary Lozow, Foster Graham Milstein & Calisher, LLP, Denver, Colorado, with him on the briefs), for Defendant-Appellant.

James C. Murphy, Office of the United States Attorney, Denver, Colorado; (John F. Walsh and Matthew T. Kirsch, Office of the United States Attorney, Denver, Colorado, with him on the brief); for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **BALDOCK**, and **EBEL**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

From 2002 to 2007, Jerold Sorensen, an oral surgeon in California, concealed his income from the Internal Revenue Service ("IRS") and underpaid his income taxes by more than $1.5 million. He did so by using a "pure trust" scheme, peddled by Financial Fortress Associates ("FFA"), an entity he found on the Internet. After attending an FFA seminar and consulting with its representatives, he began depositing his dental income into these trusts without reporting all of it to the IRS as income. Over the years, he also retitled valuable assets in the trusts' names. In 2013, after a series of proffers, the government charged him with violating 26 U.S.C. § 7212(a) for corruptly endeavoring to obstruct and impede the due administration of the internal-revenue laws. A jury convicted him of the charged offense.

On appeal, Sorensen raises seven arguments: (1) his conduct amounts to evading taxes so it is exclusively punishable under 26 U.S.C. § 7201, and not under § 7212(a); (2) the district court erred by refusing his offered instruction requiring knowledge of illegality; (3) the district court erred by giving the government's deliberate-ignorance instruction; (4) the district court erred by instructing the jury that it could convict on any one means alleged in the indictment; (5) the district court erred by refusing to allow him to provide certain testimony from a witness in surrebuttal; (6) the prosecution misstated evidence in its closing rebuttal argument; and (7) cumulative error. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that none of Sorensen's arguments merit relief. We affirm his conviction.

2

# I.    BACKGROUND

In 2000, Sorensen began looking for "a coherent sound business plan for [his] oral surgery practice. . . ." Appellant's App. vol. III at 585. He found FFA after online research. FFA offered seminars advising attendees how to reduce or even eliminate their tax liabilities using "Pure Trust Organizations" ("PTOs"). Under this system, clients learned to create so-called PTOs and open bank accounts in the trusts' names to hold personal income and title to the clients' assets. The clients could then deduct the money and value of the assets on their tax returns, lowering their taxable income.

Sorensen did not know anyone else who used FFA's programs. So in 2000, before attending an FFA seminar, he called FFA official Ed Akehurst. Akehurst referred him to FFA's attorney, Melissa Sugar, a Denver attorney with a L.L.M. in tax law. Sorensen and Sugar spoke by phone several times before he attended the seminar. Sorensen testified that Sugar assured him that the program was legal. He also testified that he was impressed with Sugar because of her education and her ability to explain the program. Sugar never billed Sorensen for these calls.

In October 2000, Sorensen attended his first FFA seminar in Atlanta, Georgia. At the seminar, he learned that FFA offered two different programs. The first was for clients wishing to "drop out" of the tax system altogether, and the second was for clients wishing to stay in the tax system but to limit their tax liabilities by using FFA's pure-trust program. Sorensen chose the latter. Several seminar speakers explained different aspects of the program. One speaker presented a letter from the IRS, supposedly supporting the pure-trust system. Sugar also spoke at the seminar,

explaining various banking aspects of the trusts. A third speaker, Akehurst, cautioned that FFA clients should not use their Social Security numbers in connection with their PTOs—supposedly to avoid identity fraud. Sorensen left the seminar impressed.

At trial, Special Agent Michelle Hagemann, a criminal investigator with the IRS, explained how FFA's PTO system worked. Using FFA's services, its clients would first establish trusts. They would then pay Sugar, or another FFA affiliate, to open a bank account in the trusts' name. In Sorensen's case, he named the bank account Northside Management. Although the bank account would, on paper, be in the name of the trusts, the clients themselves had authorization to withdraw funds from the bank account, meaning they could deposit or write checks from the account and use it as they pleased. Clients would deposit money (such as earned income) into the trusts' bank account and could then access the money at will.

FFA clients would also title and retitle personal assets, such as homes and automobiles, in the trusts' names. For example, Sorensen retitled his personal residence, dental practice, and dental equipment—all of which he owned free and clear of mortgages or debt—in the names of his trusts, and then had his dental practice "pay" the trusts to "rent" his home, dental practice, and equipment. Using this approach, he began depositing dental income directly into the Northside Management bank account. After this, he would report these expenditures as business-expense deductions[1] on his personal tax returns, avoiding taxes on those

---

[1] Denise Smith, a former employee for the IRS, testified that a business deduction allows a taxpayer to reduce his taxable income, which in turn reduces taxes owed.

amounts. Although the deductions looked legitimate, the trusts were actually shell entities.[2] Taxpayers legally cannot take business-expense deductions for payments to shell entities they control. *See* 26 U.S.C. § 183. This scheme enabled Sorensen to avoid reporting his true income to the IRS. For example, for tax year 2002, Sorensen reported $107,500 in income.

After attending the seminar, Sorensen paid FFA $9,000 to create six pure trusts: OMS Management, OMS Tools, OMS Properties, Olmec Holdings, Olmec Properties, and Olmec Enterprises.[3] Sorensen hired Sugar to open and maintain the Northside Management bank account, which was set up in the trusts' names. She did so on September 29, 2000. Soon afterward, Sorensen began depositing his dental income into this account. Sorensen was the managing director of the trusts and controlled them. Although the account showed activity from January 2002 to September 2008, an IRS employee testified that the IRS has no record of any tax returns ever being filed for any of the trusts.

Sorensen paid Sugar about $250 per year for her services, including administering the Northside Management bank account and wiring money as needed. Because Northside Management was a non-interest bearing checking account, the bank was not required to report the account to the IRS. At trial, Sorensen testified that he "didn't pay attention to" his bank statements enough to know whether this account,

---

[2] A shell entity is one that has been created for no legitimate business purpose and is usually used for tax avoidance.

[3] FFA created Olmec Enterprises to hold title to the automobiles. FFA created OMS Tools to hold title to Sorensen's dental practice equipment.

holding more than $1 million, was even accruing interest. Appellant's App. vol. III at 691. Although non-interest bearing, the Northside Management account did have an Employer Identification Number ("EIN") associated with it, with Sugar listed as the trustee. An employee of the IRS testified that the IRS had received an application from Northside Management requesting an EIN, and that the application had a notice obligating Northside Management to file a Form 1065 (partnership tax return). Even so, Northside Management never filed a Form 1065—as shown by the IRS's Certificate of Lack of Record Form 3500.

Although Sugar was listed as the "Trustee" of the Northside Management account, Sorensen had signatory authority over it as an "administrative assistant" to Sugar. Regardless of his title, Sorensen controlled the account, and he signed all of the checks written from the account.

By late 2001, Sorensen had transferred to the trusts the titles to valuable assets that he owned debt-free. These included his California home, his dental building, and his dental equipment. In addition to these asset transfers, from 2002 to 2007, Sorensen deposited into the trusts hundreds of thousands of dollars of dental income. Although Sorensen testified that he knew that using trust money from the Northside Management account for personal use created tax consequences (meaning he had to pay taxes on that money), he still did so without paying taxes. For instance, Sorensen used that money to build and furnish a second personal residence in Utah valued at well over a million dollars, to purchase automobiles, and to give gifts to family

members. At trial, he testified that the second home in Utah was an investment for the trusts.

Soon after establishing the pure trusts, Sorensen approached his longtime accountant and family friend, Rita Sharp, seeking assurances about FFA's pure-trust program. Sharp testified that she had difficulty understanding the program and that Sorensen told her that an FFA-seminar speaker had said that most accountants would not understand it. After reviewing the program, Sharp was so concerned that she did some outside research, including indirectly reaching out to the IRS. After hearing back, she reported to Sorensen that the IRS "considered [the pure trusts] a scheme." Appellant's App. vol. II at 291–92. She informed Sorensen that if he continued to use the PTO program, she would no longer prepare his tax returns. At trial, she testified that "[t]he point that struck me as most obvious was the fact that we didn't have to get a Federal ID number to establish this trust." Appellant's App. vol. II at 288. She explained to Sorensen that despite FFA's direction, entities must always obtain one for reporting purposes. In 2002, she prepared Sorensen's tax returns one last time. In this final return, she included a disclosure statement regarding the trusts.

After Sharp declined to provide Sorensen more services, Sorensen hired Wayne Paul—an accountant FFA referred to him—to prepare his business tax returns. Sorensen testified that he believed in Paul and thought he was a competent CPA because FFA had referred him. He also felt that Paul had a national reputation, apparently based on his being a brother to Ron Paul, a former Texas congressman. Also beginning in 2003, Sorensen hired H&R Block to prepare his personal tax

7

returns. Sorensen testified that "the cost was certainly a factor" in using H&R Block rather than Paul for his personal tax returns. R. vol. III at 641. He explained not having told H&R Block about the high balance of Northside Management's account—in excess of a million dollars—because "it was not asked for." Appellant's App. vol. II at 642.

At trial, Agent Hagemann testified that during a proffer session, Sorensen had told her that from 2003–2004 he had diligently looked for "either an attorney or a CPA that would validate" the pure-trust program, but he did not find anyone. Appellant's App. vol. IV at 890–91. He admitted ignoring this "red flag." Appellant's App. vol. III at 700–01; Appellant's App. vol. IV at 891, 893. He also admitted that he should have had someone else review the program's legality.

In 2004, Sorensen attended another FFA seminar in San Diego, California. At trial, he testified that while at the seminar, he overheard Jim Gailey, an accountant affiliated with FFA (he had been one of the speakers at the Atlanta seminar in 2001), say that because FFA's pure trusts do not require EINs, the IRS cannot track them. Sorensen wrote down this information in his notebook, intending to explore it later, but never did so. Sorensen acknowledged that he should have seen Gailey's statement as "another red flag." Appellant's App. vol. IV at 892.

In May 2007, IRS Special Agent Greg Flynn executed a federal search warrant at Sugar's law office. By August 2007, Sorensen knew about the search warrant but still continued to use FFA's PTO program. In one of his proffers with Agent Hagemann, and confirmed during his testimony, Sorensen said that after learning about the

8

search, he questioned why he was still using the FFA program, and he wondered "whether the same thing would happen" to him. Appellant's App. vol. III at 704. Agent Hagemann testified that Sorensen told her in the proffer meeting that "he was in too deep, he couldn't get out, and he didn't want to pay the tax." Appellant's App. vol. IV at 893.

Also in 2007, Sorensen first approached CPA Keith Wilcox, his son's father-in-law, to discuss his "situation" with the IRS. Wilcox testified that "[i]t was very obvious to [him] that the purpose for the meeting was that [Sorensen] . . . wanted to convince his wife that what they were doing and what was going on was completely legal . . . ." Appellant's App. vol. III at 732. After an extensive analysis, Wilcox helped Sorensen prepare his amended tax returns. Wilcox testified that he told Sorensen he believed the trusts were "a complete sham." Appellant's App. vol. III at 734. Although Wilcox prepared the amended returns, Sorensen ignored Wilcox's advice and did not file them for another two years, based, he said, on his personal attorney's advice.

In 2008, Agent Hagemann sent Sorensen a letter by certified mail notifying him that he was the target of a criminal investigation. Sorensen refused to sign for the letter. At trial, he explained that an FFA-seminar speaker had advised against accepting certified mail from the IRS if a client did not know what the mail contained. Later, when Agent Hagemann came to his office, he locked the doors and refused her entrance. When he realized that Agent Hagemann was investigating him, he followed FFA's advice and sent her a public-servant's questionnaire, requesting

personal information including her home address, birthday, and social security number.

Sorensen's defense theory was that he believed the PTOs were legal when he used them. At trial and on appeal, he admits that the "payments" made to the PTOs were not legitimate business deductions because their only purpose was to avoid paying taxes. He also admits that neither the PTOs nor Northside Management ever filed a tax return.

Sorensen also admits on appeal that between 2002 and 2007, he underpaid his taxes by more than $1.5 million. For example, in 2000—before using the pure trusts—Sorensen paid just over $210,856 in federal taxes. In 2002, after he began using the pure trusts, he paid only $11,798 in federal taxes.

In November 2013, a federal grand jury sitting in Colorado indicted Sorensen, charging him with violating the omnibus clause of 26 U.S.C. § 7212(a) by "corrupt[ly] endeavor[ing] to obstruct or impede due administration of the Internal Revenue laws . . . ."[4] Appellant's App. vol. I at 11. At trial, the primary issue was whether the statute required knowledge of illegality and whether Sorensen had acted with such knowledge. Sorensen testified that during the time charged in the indictment, he had believed the PTOs were legal. The defense argued that Sorensen was a gullible, naïve man, unaware that his conduct violated the law. In support, Sorensen relied upon a forensic psychiatrist, Dr. Dana Cogan, M.D., who testified

---

[4] In its indictment, the grand jury also charged Sorensen with obstruction of justice, in violation of 18 U.S.C. § 1503. Before trial, the government dismissed this second count.

10

that Sorensen was "law abiding," "very naïve," and easily manipulated by others. Appellant's App. vol. IV at 780–83, 802–04.

In 2014, the jury convicted Sorensen of corruptly endeavoring to obstruct or impede the due administration of the internal-revenue laws, in violation of § 7212(a)'s omnibus clause. Although the advisory guideline range was 51 to 63 months, the statutory maximum was 36 months, which became the advisory range. The district court varied downward, sentencing him to 18 months of imprisonment. Sorensen timely appealed.

On appeal, Sorensen raises seven issues: (1) that his conduct amounts to evading taxes and so is punishable under 26 U.S.C. § 7203, which, he says, thus precludes prosecution for obstructing or impeding the tax laws under § 7212(a); (2) that the district court erred by refusing to give a knowledge-of-illegality jury instruction; (3) that the district court erred by giving a deliberate-ignorance instruction; (4) that the district court erred by allowing the jury to convict on any one of the "means" charged in the indictment; (5) that the district court erred by disallowing Sorensen from presenting surrebuttal evidence; (6) that the prosecution's closing rebuttal argument misstated the evidence; and (7) that the errors taken cumulatively amount to reversible error.

We conclude that none of Sorensen's arguments have merit. For the following reasons, we affirm the district court.

## II.    DISCUSSION

### A. Availability of Charge Under 26 U.S.C. § 7212(a)

The jury convicted Sorensen under the "omnibus clause" of § 7212(a) for "corruptly . . . endeavor[ing] to obstruct or impede, the due administration of this title. . . ." 26 U.S.C. § 7212(a) (2012). Sorensen generally contends that, as a matter of law, the government must prove something more than tax evasion for a conviction under this statute.[5] We review de novo questions of statutory interpretation. *United States v. Sturm*, 672 F.3d 891, 897 (10th Cir. 2012).

To establish a violation of § 7212(a)'s omnibus clause, the government must prove that the defendant "in any other way, corruptly . . . endeavors to obstruct or impede, the due administration of [Title 26]."[6] As noted in *United States v. Williamson*, 746 F.3d 987, 992 (10th Cir. 2014), "the federal appellate courts have agreed (although with some insignificant variations in language) on the definition of *corruptly* . . . : 'To act "corruptly" is to act with intent to gain an unlawful advantage or benefit either for oneself or for another.'" (emphasis in original); *see also United States v. Winchell*, 129 F.3d 1093, 1098 (10th Cir. 1997) (declaring that "to act

---

[5] We note that the government does not assert that it proved tax evasion or that its doing so would necessarily prove Sorensen corruptly endeavored to obstruct or impede the due administration of the tax code. Thus, despite Sorensen's general contention, we have no reason in his case to decide whether evading taxes under § 7201 would sometimes or always satisfy § 7212(a)'s omnibus clause.

[6] We agree with *United States v. Popkin*, 943 F.2d 1535, 1539 (11th Cir. 1991), that the omnibus language "in any other way" "greatly expands the reach of the statute," meaning that "the prohibited act need not be an effort to intimidate or impede an individual officer or employee."

12

corruptly [under § 7212(a)] means to act with the intent to secure an unlawful benefit either for oneself or another"). Here, the district court included this same language in its instruction.

In addition, we have cited favorably other cases broadly interpreting § 7212(a)'s omnibus clause. For instance, in *United States v. Wood*, 384 F. App'x 698 (10th Cir. 2010) (unpublished), we approved the Eleventh Circuit's statement that "'corruptly' . . . prohibit[s] all activities that seek to thwart the efforts of government officers and employees in executing the laws enacted by Congress." *Id.* at 703 (quoting *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991)). Further emphasizing § 7212(a)'s broad scope, we concluded that "even legal actions violate § 7212(a) if the defendant commits them to secure an unlawful benefit for himself or others." *Id.* (quoting *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997)).

Sorensen argues that the government improperly charged tax obstruction under § 7212(a) when its evidence instead showed tax evasion under § 7201. He contends that when a taxpayer's conduct results in evaded taxes, the government must charge tax evasion under § 7201 and not obstructing or impeding the due administration of the tax code under § 7212(a). He asserts that "obstruction requires something more than simply tax evasion, false tax filings, and non-filings[,]" conduct specifically proscribed at 26 U.S.C. §§ 7201 and 7203. Appellant's Br. at 10; *see* 26 U.S.C. §§ 7201, 7203, 7206 (2012). He claims that this court has "not had to set boundaries between [tax] evasion and [tax] obstruction" and asks that we do so now. Appellant's Br. at 12.

13

The government rejects Sorensen's proposition. Because Congress enacted separate tax-crime statutes, the government has the "plenary power to choose which charge it will bring." Appellee's Br. at 14. The Supreme Court "has long recognized that when an act violates more than one criminal statute, the Government may prosecute[] under either . . . ." *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979); *see also Ball v. United States*, 470 U.S. 856, 859 (1985) (recognizing "the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case"); *United States v. Beacon Brass Co.*, 344 U.S. 43, 45 (1952) ("At least where different proof is required for each offense, a single act or transaction may violate more than one criminal statute."); *Gavieres v. United States*, 220 U.S. 338, 342 (1911) ("A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other") (quoting *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871)). Based on this legal principle, it follows that the government is free to charge tax obstruction even when the underlying conduct includes (or may be argued to include) tax-evasive conduct.

We now turn to why tax evasion and tax obstruction are not identical crimes. In *Williamson*, we rejected the argument that "corruptly" has the same meaning as "willfully" as used to prove tax evasion under 26 U.S.C. § 7201—the "*voluntary, intentional violation of a known legal duty*." 746 F.3d at 991 (emphasis in original) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)). Further, we noted that

14

Congress chose to use two different elements—corruptly versus willfully—to define the separate mens-rea requirements in defining the separate tax crimes. *Id.* at 991–92.

In addition to these differences, it is also important to consider that the two statutes provide different penalties. Willfully evading taxes is the more serious crime, punishable by up to five years of imprisonment, while corruptly obstructing or impeding the due administration of the tax laws is punishable by up to three years. The difference in penalties suggests that a violation of § 7212(a) requires different culpability and wrongdoing than a violation of § 7201.

In support of his argument that the government had no discretion to charge his case under § 7212(a), Sorensen directs us to the Department of Justice's evolving commentary on charging decisions under § 7212(a). In U.S. Department of Justice Tax Div., Criminal Tax Manual § 3.00, Tax Division Directive No. 129 (2004),[7] the Tax Division of the Department of Justice advised its personnel of its view about when a charge under § 7212(a)'s omnibus clause would be "particularly appropriate" (for "corrupt conduct that is intended to impede an IRS audit or investigation") and "[could] also be authorized" (for "large-scale obstructive conduct involving the tax liability of third parties," even occurring pre-audit or pre-investigation). It also instructed that the charge "should not be used as a substitute for a charge directly related to tax liability—such as tax evasion or filing a false tax return—if such a charge is readily provable." *Id.* If Sorensen is claiming that this agency directive

---

[7] This superseded Directive No. 77 (1989), which set forth even more limiting guidance for prosecutors desiring to seek charges under 26 U.S.C. § 7212(a)'s omnibus provision.

15

somehow compels that we reverse his conviction, we disagree for at least two reasons.

First, we will not second-guess the government's view about what is "readily provable" and what is not. We find it interesting that Sorensen apparently concedes that a tax evasion conviction—even with its strict "willfully" mens-rea requirement—was readily provable. But that decision properly belongs with the government.

Second, "criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 134 S. Ct. 2259, 2274 (2014); *see also United States v. Apel*, 134 S. Ct. 1144, 1151 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."). Moreover, "non-compliance with internal departmental guidelines is not, of itself, a ground of which defendants can complain." *United States v. Ivic*, 700 F.2d 51, 64 (2d Cir. 1983) (citing *United States v. Caceres*, 440 U.S. 741 (1979)), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994).

In addition to the DOJ's internal guidance, Sorensen relies on *Wood*, where we stated that it "is a questionable proposition" whether failure to file tax returns constitutes a "corrupt[] endeavor to obstruct and impede the due administration of the internal revenue laws." 384 F. App'x at 708. Although we need not decide that matter today, we still adhere to that view. For starters, we note that failure to file tax returns under § 7203 is punishable as a misdemeanor, while tax obstruction is punishable as a felony. Because of this disparity, we agree with *Wood*'s hesitation to allow proof of a misdemeanor to prove a felony. But this same concern does not apply to tax evasion, a felony even more

16

severely punished than obstructing or impeding due administration of the tax code. And Sorensen's case involves obstruction going beyond simply evading his taxes—for instance, he used FFA's pure trusts with no EIN, which prevented the IRS from tracking them. This obstructed and impeded the IRS in duly administering the tax code.

Next, Sorensen contends that cases applying § 7212(a) to tax-evasion conduct have "typically involve[d] conduct of tax professionals extending beyond a defendant's own returns." Appellant's Br. at 13. As a lead case, he cites *United States v. Popkin*, 943 F.2d 1535 (11th Cir. 1991). True enough, the defendant in that case was not the person directly benefitting from impeding or obstructing the IRS from duly administering the tax laws. Instead, he was a drug-dealer's attorney who created an offshore corporation to help his client repatriate drug proceeds and avoid paying taxes. *Id.* at 1536. While Sorensen correctly points out that *Popkin* involved a perpetrator occupying a different position than Sorensen's, we see nothing in *Popkin* limiting the reach of § 7212(a)'s omnibus clause to third parties helping impede or obstruct due administration of the tax laws. Rather than focusing on *who* committed the crime, we conclude that the proper focus is on *what conduct* sufficed to prove that someone had corruptly obstructed or impeded the due administration of the tax laws. *Popkin* favors the government here, because the conduct—setting up the offshore corporation to avoid taxes—is similar to Sorensen's conduct in setting up trusts and the Northside Management bank account. It would make little sense to conclude that Sorensen's helpers could violate § 7212(a), but he could not. *Cf. United States v. Melot*, 732 F.3d 1234, 1237 (10th Cir. 2013) (listing the means of defendant's indictment for his § 7212(a) convictions as his opening bank accounts with false Social

17

Security numbers and EINs; depositing receipts from his businesses to bank accounts titled in the names of nominees; depositing cash in amounts less than $10,000 to avoid reporting requirements; titling property in the name of nominees; and maintaining a foreign bank account); *Wood*, 384 F. App'x at 704–05 (affirming conviction under § 7212(a)'s omnibus clause for means specified in the indictment, including transferring funds into offshore bank accounts from which to draw tax-free money, by way of foreign-issued debit-cards for his clients' friends and associates).

Sorensen next argues that we should limit § 7212(a)'s scope because our Circuit's cases under that section have all involved prosecutions for "prototypical acts of obstruction." Appellant's Br. at 12 (citing *Williamson*, 746 F.3d at 989 (filing a bogus "claim of lien against the [IRS] agents' real and personal property")); *United States v. Thompson*, 518 F.3d 832, 855 (10th Cir. 2008) (presenting agent with "a false, back-dated loan document" of pending IRS investigation); *United States v. Winchell*, 129 F.3d 1093, 1094–99 (10th Cir. 1997) (sending threatening and harassing notices and bills to IRS agents). By this, we understand Sorensen to be arguing that it necessarily follows that § 7212(a)'s omnibus clause is so limited. We reject this on the same basis that the Eleventh Circuit did in *Popkin* when addressing a similar argument. There, the defendant argued that the court should limit the omnibus clause to "claim[s] of the use of force or threats of force against an individual agent or employee," because "the government has never used § 7212(a) for prosecutions in which there was not [such a claim]." 943 F.2d at 1539. The court concluded that the government's earlier choice of prosecutions "proves nothing . . . ."

18

*Id.* Instead, the court relied on the statute's plain language to affirm the conviction. *Id*. We agree with that approach. Even if the government had never prosecuted someone in Sorensen's position—and it did so in *Melot* and *Wood*—we still would look to the statute's plain language and conclude that Sorensen's charge fits within the omnibus clause.

## B. Jury Instructions

Sorensen next challenges three of the district court's jury instructions. First, he contends the district court erroneously refused to give a knowledge-of-illegality instruction. Second, he argues the court erroneously gave a deliberate-ignorance instruction. And third, he argues the court erroneously gave an instruction that allowed the jury to convict on any one of the "means" alleged in the indictment.

We review a district "court's decision on whether to give a particular jury instruction for abuse of discretion and view[] the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *Williamson*, 746 F.3d at 990 (quoting *United States v. Villegas*, 554 F.3d 894, 900 (10th Cir. 2009)). We look particularly at whether the jury, considering the instructions as a whole, was misled. *United States v. Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994). "Only where the reviewing court has 'substantial doubt that the jury was fairly guided' will the judgment be disturbed." *Id.* (quoting *United States v. Mullins*, 4 F.3d 898, 900 (10th Cir. 1993)). After undertaking our review, we conclude that none of Sorensen's claims have merit.

19

*i.*    *Knowledge-of-illegality instruction*

First, Sorensen challenges the district court's instruction on § 7212(a) because he claims it did not inform the jury that he could be guilty only if he intentionally violated a known legal duty. The district court's instructions set forth the following elements of the offense:

*First*: The defendant in any way corruptly;

*Second*: Endeavored to;

*Third*: Obstruct or impede the due administration of the internal revenue laws.

"Endeavor" means to knowingly and intentionally make any effort which has a reasonable tendency to bring about the desired result. It is not necessary for the government to prove that the "endeavor" was successful.

To act "corruptly" is to act knowingly and dishonestly, with the specific intent to gain an unlawful advantage or benefit either for oneself or for another by subverting or undermining the due administration of the internal revenue laws.

To "obstruct or impede" is to hinder or prevent from progress; to slow or stop progress; or to make accomplishment difficult and slow.

The phrase "due administration of the internal revenue laws" means the Internal Revenue Service of the Department of the Treasury carrying out its lawful functions to ascertain income; compute, assess, and collect income taxes; audit tax returns and records; and investigate possible criminal violations of the internal revenue laws.

Appellant's App. vol. I at 100. The court refused Sorensen's proffered instruction that "[t]he Defendant must have known the advantage or benefit sought was unlawful." R. vol. I at 76; R. vol. IV at 949–50. At trial, Sorensen's counsel objected to the omission. On appeal, Sorensen contends that the jury was not instructed on the proper mens rea

element. He asserts that the district court should have instructed the jury that knowledge of illegality is required.

We review de novo the question of whether a district court incorrectly instructed a jury on the law. *United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014). "When we review a claim of error relating to jury instructions, we read and evaluate the instructions in light of the entire record to determine if they 'fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them.'" *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 771 (10th Cir. 1999) (quoting *United States v. Barrera–Gonzales*, 952 F.2d 1269, 1272 (10th Cir. 1992)). Even when the district court fails to include an element of the crime in the instruction (including a mens rea element), we still apply the harmless error rule, asking "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder v. United States*, 527 U.S. 1, 15 (1999) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also United States v. Sierra-Ledesma*, 645 F.3d 1213, 1217 (10th Cir. 2011).

In support of his argument, Sorensen relies on *Williamson*. In *Williamson*, decided under the plain-error standard, we left "to another day whether a conviction under § 7212(a) requires that the defendant knew that the advantage or benefit he sought was unlawful and, if so, whether the instruction here would adequately inform a jury of that requirement." 746 F.3d at 992. The instruction in *Williamson* included some of the same language as Sorensen's instruction: "To act 'corruptly' is to act with the intent to gain an unlawful advantage or benefit either for oneself or for another." *Id.* at 990 (alterations in

21

original). And Williamson made the same argument as Sorensen: that the instruction was flawed because it did not instruct the jury that it must find that he knew that the advantage or benefit was unlawful. Reviewing for plain error, we concluded that Williamson did not meet the second prong of review—that the error was plain. *Id.* at 992–93. We explained that Williamson had not cited any decision (much less one from this court or the Supreme Court) holding that this instruction, as written, would not already require knowledge of illegality. *Id.* In light of his failure to demonstrate the alleged error was plain, we declined to decide this question. *Id.* at 992.

Thus, Sorensen is correct that the *Williamson* court declined to decide whether this quoted definition of "corruptly" already requires knowledge of illegality. But as in *Williamson*, we need not decide that question. Here, in language beyond that given to the jury in *Williamson*, the district court instructed the jury that to act corruptly, the defendant must have acted "*knowingly and dishonestly*, with the specific intent to gain an unlawful advantage or benefit either for oneself or for another by subverting or undermining the due administration of the internal revenue laws."[8] Appellant's App. vol. I at 100 (emphasis added). Other circuits have concluded that this instruction—with

---

[8] Interestingly, the Second Circuit addressed the *Williamson* question in *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998). In *Kelly*, the district court had provided the same jury instruction on § 7212(a) as given in *Williamson*. *Id.* at 176–77. The court found that the "district court's definition of the proof required for the section 7212(a) violation was as comprehensive and accurate as if the word 'willfully' was incorporated in the statute." *Id.* at 177. Thus, at least one circuit has concluded that the same instruction given in *Williamson*—even not supplemented with the "knowingly and dishonestly" language given in Sorensen's case—is sufficient to require knowledge of illegality.

22

"knowingly and dishonestly" added—requires proof that the defendant knew his actions were unlawful. *See United States v. Dean*, 487 F.3d 840, 853 (11th Cir. 2007); *United States v. Saldana*, 427 F.3d 298, 303 (5th Cir. 2005).

Considering the "knowingly and dishonestly" language in Sorensen's jury instruction, we cannot perceive how the jury could have convicted him without finding that he knew that his actions were illegal. How could one act knowingly and dishonestly, with the specific intent to gain an unlawful advantage, without knowing that the advantage is unlawful? By requiring Sorensen's acts be done "knowingly and dishonestly," the district court had already required proof of knowledge of illegality.

The district court's instruction on good faith also supports our conclusion. The instruction states that:

> Dr. Sorensen submits that his actions surrounding the use of the FFA pure trust program were not corrupt as he was acting in good faith.
>
> A defendant does not act corruptly if he believes in good faith that he is acting within the law, or that his actions comply with the law. A person acts in good faith when he acts in accordance with an honestly held belief, opinion or understanding, even though the belief, opinion or understanding is inaccurate or incorrect.
> . . .
> The burden of proof is not on the defendant to prove good faith as a defendant has no burden to prove anything. However, you may consider the reasonableness of the defendant's belief together with all the other evidence in the case in determining whether the defendant held the belief in good faith. As I have already instructed you, the government must prove beyond a reasonable doubt that the defendant acted corruptly.

Appellant's App. vol. I at 104–05.

When reviewing jury instructions as a whole, we must look at whether the jury was misled. *Smith*, 13 F.3d at 1424. Because the jury did not acquit, we know it found that

23

Sorensen did not in good faith believe he was acting within or complying with the law (the entire basis of his defense at trial). Therefore, any argument he now makes that he reasonably believed he was acting within the law—e.g., his reliance on Sugar, Paul, or the IRS letter—runs counter to the jury's decision. The jury's rejection of Sorensen's good-faith defense is entirely consistent with a finding that he knew his conduct was illegal—or even that he sheltered himself from this knowledge by deliberate ignorance. Moreover, the last sentence of the instruction reminding the jury that the government must prove that Sorensen acted corruptly tied right back to the district court's instruction defining "corruptly"—"to act knowingly and dishonestly, with the specific intent to gain an unlawful advantage or benefit either for oneself or for another by subverting or undermining the due administration of the internal revenue laws." Appellant's App. vol. I at 100.

Finally, Sorensen suggests that the government can only charge tax obstruction under § 7212(a) when the defendant knows of a pending IRS investigation or audit. He relies on *United States v. Kassouf*, 144 F.3d 952 (6th Cir. 1998), in which the Sixth Circuit concluded that "due administration of the Title [under § 7212(a)] requires some pending IRS action of which the defendant was aware." *Id.* at 957. The Sixth Circuit compared the language of § 7212(a) to the facially similar language in the obstruction-of-justice statute, 18 U.S.C. § 1503(a), and found them sufficiently similar to apply the Supreme Court's reasoning in *United States v. Aguilar*, 515 U.S. 593, 599 (1995), to both. *Id.* at 956–57. *Aguilar* concerned the obstruction-of-justice statute, and construed the following statutory language:

*Whoever corruptly*, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, *influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice*, shall be punished as provided in subsection (b).

18 U.S.C. § 1503(a) (emphasis added). In comparison, § 7212(a) states:

*Whoever corruptly* or by force or threats of force (including any threatening letter or communication) endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force (including any threatening letter or communication) *obstructs or impedes, or endeavors to obstruct or impede, the due administration of this title*, shall, upon conviction thereof, be fined not more than $5,000, or imprisoned not more than 3 years, or both, except that if the offense is committed only by threats of force, the person convicted thereof shall be fined not more than $3,000, or imprisoned not more than 1 year, or both. The term "threats of force", as used in this subsection, means threats of bodily harm to the officer or employee of the United States or to a member of his family.

(emphasis added). In *Aguilar*, the Supreme Court held that obstruction of justice requires a defendant's knowledge of a pending proceeding. 515 U.S. at 599. Sorensen argues that we should follow *Kassouf*.[9]

---

[9] The Sixth Circuit limited *Kassouf* to "its precise holding and facts" in *United States v. Bowman*, 173 F.3d 595, 600 (6th Cir. 1999). The court upheld a § 7212(a) conviction for a defendant who had no knowledge of a pending IRS action. *Id.* at 600. But more recently in *United States v. Miner*, 774 F.3d 336, 345 (6th Cir. 2014), the Sixth Circuit affirmatively held that "a defendant may not be convicted under the omnibus clause unless he is 'acting in response to some pending IRS action of which

25

In *Wood*, 384 F. App'x at 703–04, we expressed skepticism of the Sixth Circuit's approach. After examining the two provisions, we found that the obstruction-of-justice statute that the Sixth Circuit had relied on is "substantially different than § 7212(a)." *Id.* at 704. While obstruction of justice deals with "specific prohibitions of conduct that interferes with actual judicial proceedings[,]" a defendant can violate § 7212(a) without an "awareness of a particular action or investigation, for example, by thwarting the annual reporting of income." *Id.*

We agree with *Wood* and disagree with *Kassouf*. We do not think the two statutes are sufficiently similar to apply *Aguilar*'s reasoning to § 7212(a). Because § 1503(a) requires that a defendant must corruptly endeavor to influence, intimidate, or impede any juror, officer of the court, or magistrate judge in court-related duties, it inherently requires that the obstructive conduct take place during an ongoing proceeding. In contrast, § 7212(a) does not require an ongoing proceeding when a defendant "corruptly . . . endeavor[s] to obstruct or impede the due administration of" the tax laws. *See United States v. Floyd*, 740 F.3d 22, 31–32 & n.4 (1st Cir. 2014) (concluding that "[a] conviction for violation of section 7212(a) does not require proof of . . . an ongoing audit," citing *Wood* approvingly, and declaring that *Kassouf* was not good law). In many instances, the IRS does duly administer the tax laws even before initiating a proceeding.

We believe that the jury instruction defining "due administration of the internal revenue laws" further supports our view. Illustrating how the IRS duly administers the

[he is] aware.'" *Id.* at 345 (quoting *United States v. McBride*, 362 F.3d 360, 372 (6th Cir. 2004)).

26

internal-revenue laws, it includes the IRS's "carrying out its lawful functions to ascertain income; compute, assess, and collect income taxes. . . ." Appellant's App. vol. I at 100. In its computing taxes owed, for instance, the IRS need not open a proceeding. We note that Sorensen did not object to the instruction defining "due administration of the internal revenue laws" and that he has not contended on appeal that giving the instruction was plain error.

### ii. Deliberate-ignorance instruction

Next, Sorensen challenges the district court's giving a deliberate-ignorance instruction. The district court instructed the jury that "knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact. Knowledge can be inferred if the defendant was aware of a high probability of the existence of the fact in question, unless the defendant did not actually believe the fact in question." Appellant's App. vol. I at 102. When a defendant challenges a district court's instructing a jury on deliberate-ignorance, we review de novo. *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991); *see also United States v. Anaya*, 727 F.3d 1043, 1060 (10th Cir. 2013).[10]

---

[10] The government concedes that this court applies a de novo standard to the district court's giving of a deliberate-ignorance jury instruction. But it contends that de novo review is inappropriate, noting that this approach is inconsistent with our general practice of reviewing a court's decision to give a particular instruction for abuse of discretion. *See United States v. Soussi*, 316 F.3d 1095, 1106 (10th Cir. 2002) (noting that de novo review of the propriety of deliberate-ignorance instructions is inconsistent with our regular practice of reviewing a court's decision to give a particular instruction for abuse of discretion). The government thus asks us to review for abuse of discretion. It submits *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc), where the Ninth Circuit overruled the de novo review standard it

27

In *United States v. Baz*, 442 F.3d 1269, 1271 (10th Cir. 2006), we held that a deliberate-ignorance instruction is appropriate where a defendant "denies knowledge of an operant fact but the evidence, direct or circumstantial, shows that defendant engaged in deliberate acts to avoid actual knowledge of that operant fact." *Id.* at 1271–72. A deliberate-ignorance instruction is appropriate upon two showings: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). Sorensen defended the charge by denying that he knew FFA's pure-trust program was illegal, and particularly that he knew that the IRS considers them illegal. Thus, we must determine whether this case is an appropriate one for the district court to have given a deliberate-ignorance instruction.

The district court noted that the instruction is generally "not favored," Appellant's App. vol. IV at 950, but found it appropriate in this case because of the evidence showing that Sorensen had been told early-on that the IRS considered pure-trust programs like FFA's to be a scheme, and knew of other "red-flags" suggesting illegality. Appellant's App. vol. IV at 950.

Sorensen argues that the instruction was unwarranted because he did not deny knowledge of any fact—he only denied criminal intent. "[W]here the trial court refused to instruct on knowledge of illegality, there was no disputed knowledge element to which

---

used when determining the propriety of deliberate-ignorance instructions and replaced it with an abuse-of-discretion standard. *Id.* at 922. Because our Circuit currently applies de novo review, we will continue to apply it unless we decide otherwise after an en banc hearing.

28

the deliberate ignorance instruction could attach." Appellant's Br. at 22. Therefore, he contends, giving the instruction was erroneous.

The government describes Sorensen's argument as mere semantics when he argues that the knowledge in question must be of an "operative fact." Appellee's Br. at 23. It submits *United States v. Santos*, 553 U.S. 507, 521 (2008), where the Supreme Court approved a willful-blindness instruction in a money laundering case to establish "knowledge that the transaction involves profits of unlawful activity[.]" 533 U.S. at 521. Similarly here, we think the instruction assisted the jury in determining whether the government had proved Sorensen's knowledge of facts bearing on the pure trusts' illegality. *See United States v. Hilliard*, 31 F.3d 1509, 1515 (10th Cir. 1994) (referencing a regulatory board's position on the legality of defendant's actions as one of the facts the deliberate-ignorance instruction could reach). Moreover, Sorensen himself admits that courts have upheld a deliberate-ignorance instruction in other tax-crime cases in which knowledge of illegality was required. *See United States v. Stadtmauer*, 620 F.3d 238, 254–57 (3d Cir. 2010) (rejecting defense argument that such an instruction was contrary to *Cheek*).

Sorensen's argument is also refuted by *United States v. Fingado*, 934 F.2d 1163 (10th Cir. 1991), where we upheld a deliberate-ignorance instruction when a defendant "was aware of a high probability that his understanding of the tax laws was erroneous and consciously avoided obtaining actual knowledge of his obligations." *Id.* at 1166. Similarly in this case, the government provided considerable evidence that Sorensen had at least attempted to remain deliberately ignorant of the pure trusts' illegality: (1) early

on, Rita Sharp warned Sorensen that the IRS considered pure-trust programs like the FFA's to be a scheme, which Sorensen admitted was a red flag; (2) Sorensen admitted that, before becoming involved with FFA, he had never sought the advice of CPAs or attorneys unaffiliated with FFA; (3) although Sorensen had Wayne Paul prepare his business tax returns, he had H&R Block prepare his personal tax returns; (4) Sorensen testified that he never told H&R Block about the balance exceeding $1 million in the Northside Management bank account because "it just never came up"; (5) Sorensen refused to accept a certified letter from the IRS, on FFA's advice; and (6) despite concerns about the federal search warrant executed at Sugar's office, Sorensen continued to use FFA because by then, he said, "he was in too deep, he couldn't get out, and he didn't want to pay the tax." Appellant's App. vol. III at 687–88, 893. When considered as a whole, there is ample evidence to support the notion that Sorensen deliberately avoided learning that the IRS deemed the pure trusts illegal.

Sorensen tries to distinguish his case from *Fingado*, claiming instead the facts of his case are more analogous to *Hilliard*, 31 F.3d at 1510–14. In *Hilliard*, we reversed a jury's conviction after concluding that the deliberate-ignorance instruction was inappropriate in a situation where the facts "involv[ed] somewhat complicated financial transactions combined with professional legal and accounting advice of varying quality, some of which was heeded, and some of which was not." *Id.* at 1516. The defendant in *Hilliard*, the director and president of National Savings Bancorporation of Colorado, was convicted of misapplication of funds, which rested in part on a series of deferred tax transactions he made. *Id.* at 1510, 1513. As part of our explanation for why the

30

deliberate-ignorance instruction was inappropriate in this case, we stated that the defendant never denied actual knowledge of the Federal Home Loan Bank Board's position that these transactions violated the applicable statute. *Id.* at 1515. Rather, we explained that the defendant questioned the Board's position based on (1) his own prior experience, (2) a discussion he had with regulatory counsel at the bank, and (3) an opinion letter from the bank's regulatory firm. *Id.*

In contrast, Sorensen rests his entire defense on his lack of knowledge regarding the illegality of the pure trusts. He never claims to have discussed the trusts' legal status with anyone at the IRS or even consulted the IRS website. While he contends that he received professional advice that his actions were legal—from Sugar and Paul—his circumstance is different from Hilliard's because all of his advice came (directly or indirectly) from those selling him the illegal product (FFA). And this was due to Sorensen's own, knowing choice. Therefore, we see significant differences between Sorensen's case and *Hilliard*, and conclude that his case fits more closely under *Fingado*.

In conclusion, we think the evidence is more than sufficient to support the deliberate-ignorance instruction. A deliberate-ignorance instruction is appropriate where the defendant "purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Soussi*, 316 F.3d 1095, 1106 (10th Cir. 2002). Here, Sorensen's actions went beyond merely "heeding the wrong advice," as he portrays it. Appellant's Br. at 24. The government put forth more than enough evidence to allow the judge to instruct the jury on deliberate ignorance.

31

Therefore, we conclude that the district court did not err in giving the deliberate-ignorance instruction.

### iii.    *Conviction by any one means*

Third, Sorensen challenges the jury instruction that allowed the jury to convict Sorensen based on any one of the "means" alleged in the indictment. The language of the instruction read:

> Your verdict must represent the collective judgment of the jury. In order to return a verdict, it is necessary that each juror agree to it. Your verdict, in other words, must be unanimous.
>
> In this regard, the indictment alleges that the defendant endeavored to obstruct or impede the due administration of the Internal Revenue laws through a variety of different means. The government does not have to prove all of these different means for you to return a guilty verdict. But in order to return a guilty verdict, all twelve of you must agree upon one or more listed means, which you find constituted a corrupt endeavor to obstruct or impede the due administration of the Internal Revenue laws.

Appellant's App. vol. I at 106. Because neither party had requested a unanimity instruction, the district court created one *sua sponte* since it thought such an instruction "was appropriate." Appellant's App. vol. IV at 940. Upon the court's presenting of its first draft of the instruction, Sorensen's counsel objected to it on two grounds: (1) it allowed the jury to convict upon agreeing on any one of the means, not specifying which,[11] and (2) it did not require that the jury unanimously find *all* of the indictment's

---

[11] Other than reserving its motion for judgment of acquittal, Sorensen did not object to the verdict form, which did not ask the jury to specify which of the listed means it had unanimously agreed upon.

listed means.[12] The government did not object to the instruction, saying it had assumed the defense would "want some sort of unanimity" and that "the Defense would want it [the instruction]." Appellant's App. vol. IV at 942.

Upon later revisiting the unanimity instruction, the district court declared that the instruction was "needed, and not doing it—not giving some instruction in this vein gets us into the realm of plain error, invited error, waiver, and other things about appellate issues that I'm not going to go down." Appellant's App. vol. IV at 951. As a "tweak" to the instruction, the district court added language to ensure that the jury's unanimously finding a listed means did not end its inquiry—that it still must independently find that the listed means "constitute[d] an endeavor to obstruct. . . ." *Id*. at 952, 1038. In response, Sorensen's counsel directed the court to the Tenth Circuit's Pattern Jury Instruction § 1.24, at 39 (2011), pointing out that it and the case law made it "very clear . . . that unanimity is not an appropriate concept when you are talking about the means of committing the crime." *Id*. at 954. The district court stuck with its proposed instruction, explaining that "I think the cases that are cited, as I said, use the word 'means' in a slightly different way." *Id*.

We see Sorensen making two different arguments in his challenge to the instruction. First, he argues that the district court erred by giving the instruction at all. Second, in a more particular objection, Sorensen argues that the district court erred by allowing the jury to convict after unanimously agreeing on the fifth or sixth means listed in the

---

[12] Although Sorensen made this argument before the district court, he does not raise it on appeal, so we do not address it.

33

indictment—underreporting income or failing to file tax returns—because that conduct, by itself, is legally insufficient to fulfill all of § 7212(a)'s requirements.

a. Erroneous Instruction

Sorensen argues that the district court erred in even giving the unanimity instruction on "means." On this ground, he filed a written objection in the district court, asserting that the "instruction should not be given." Appellant's App. vol. I at 75. Thus, he has preserved this argument for appeal. "When reviewing claims of error in regard to jury instructions, we review the instructions as a whole de novo to ensure that the applicable law was correctly stated and review for an abuse of discretion a trial court's refusal to give an instruction as specifically requested by a party." *United States v. Allen*, 603 F.3d 1202, 1213 (10th Cir. 2010) (citing *United States v. McClatchey*, 217 F.3d 823, 834 (10th Cir.2000)). We will reverse "only in those cases where [we have] a substantial doubt whether the jury was fairly guided in its deliberations." *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009).

As mentioned, neither party requested a unanimity instruction—the court provided one *sua sponte*. To create the instruction, the district court borrowed from the unanimity pattern jury instruction on "Unanimity of Theory." The actual pattern jury instruction reads:

> Your verdict must be unanimous. Count _____ of the indictment accuses the defendant of committing the following acts: [description of individual acts].
> The government does not have to prove all of these different *acts* for you to return a guilty verdict on count _____.
> But in order to return a guilty verdict, all twelve of you must agree upon which of the listed *acts*, if any, the defendant committed and

34

that he committed at least [number of acts identified above] of the *acts* listed.

Tenth Circuit Criminal Pattern Jury Instructions § 1.24 at 39 (2011) (emphasis added). The instruction's Use Note explains that it is intended to be given when "the government introduces evidence that the defendant has committed multiple acts which may constitute an element of the crime." Tenth Circuit Criminal Pattern Jury Instructions § 1.24 Use Note, at 39 (2011). To illustrate the "acts" described, the use note refers to predicate felonies required to prove a continuing criminal enterprise under 21 U.S.C. § 848. *Id.* (citing *Richardson v. United States*, 526 U.S. 813, 817–18 (1999)). In *Richardson*, the Court held that a jury must "agree unanimously about which specific violations make up the 'continuing series of violations'" required under § 848. 526 U.S. at 815. It rejected the jury instruction that had allowed a conviction if the jury unanimously agreed that the defendant had committed at least three federal narcotics offenses but did not agree which three. *Id.* at 816.

Sorensen's charge is far different from *Richardson*'s, and § 1.24 of our pattern jury instructions does not apply to his case. Perhaps recognizing this, the district court modified it by replacing the pattern instruction's "acts" with "means":

> In this regard, the indictment alleges that the defendant endeavored to obstruct or impede the due administration of the Internal Revenue laws through a variety of different *means*. The government does not have to prove all of these different *means* for you to return a guilty verdict. But in order to return a guilty verdict, all twelve of you must agree upon one or more listed *means*, which you find constituted a corrupt endeavor to obstruct or impede the due administration of the Internal Revenue laws.

35

Appellant's App. vol. I at 106 (emphasis added). By modifying the instruction's language in this way, the court took the novel course of requiring the jury's unanimity on at least one means listed in the indictment. Although the district court's instruction kept the pattern instruction's general structure, it overlaid it with a different legal question. No longer anchored in *Richardson*'s holding, the modified instruction carried no cited support for its legal rule.[13] By requiring unanimity on a "listed" means, the instruction also ignored the indictment's language charging that Sorensen violated § 7212(a) "by the following means, *among others* . . . ." Appellant's App. vol. IV at 1031 (emphasis added). We are not at all convinced the government was required to do so.

Thus, we agree with Sorensen that the district court erred in giving the instruction. But we agree with the government that it helped him and did not prejudice him. Absent the instruction, the jury could have convicted without unanimously agreeing on any of the listed means. As such, the instruction effectively increased the government's burden in proving its case. While we disapprove of the instruction, we do not see how it harmed Sorensen.

b. The Fifth and Sixth Means—Underreporting Income and Failure to File Tax Returns

Before us, Sorensen narrows his argument to say that the district court erred in giving the instruction because it allowed the jury to convict him by agreeing on insufficient

---

[13] For comparison, we note that § 2.87 of the Tenth Circuit's pattern jury instructions pertains to drug-conspiracy charges and provides that "[t]he evidence in the case need not establish that all the means and methods set forth in the indictment were agreed upon to carry out the alleged conspiracy."

36

means, the indictment's fifth and sixth listed ones: underreporting his income and failing to file tax forms for Northside Management or tax returns for his pure trusts. As previously discussed, Sorensen contends that the conduct in these means is legally insufficient to satisfy § 7212(a)'s requirements. After carefully reviewing the record, we conclude that Sorensen failed to object in the district court to the instruction on these bases. In his brief, Sorensen points to his counsel's written objection to giving the instruction at all and cites to Pattern Jury Instruction § 1.24 and its Use Note. But that objection does not make this particular argument.

Thus, we review for plain error. *See United States v. Fabiano*, 169 F.3d 1299, 1301–03 (10th Cir. 1999). To establish plain error, Sorensen bears the burden of showing: (1) error, (2) that is plain, (3) that affects his substantial rights, and (4) would seriously affect the fairness, integrity, or reputation of the proceedings. *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) and *United States v. Olano*, 507 U.S. 725, 732 (1993)).

Sorensen asserts that the district court erred under *Yates v. United States*, 354 U.S. 298 (1957),[14] in which the Supreme Court held—reviewing de novo, unlike here—that a verdict must be vacated where it is supportable on one ground, but not on another, and it is impossible to tell which ground the jury relied upon to convict. *Wood*, 384 F. App'x at 709 (citing *Yates*, 354 U.S. at 312). According to Sorensen, because the indictment's fifth and sixth listed means—underreporting income and not filing taxes—could not, as a

_____

[14] *Overruled in part on other grounds by Burks v. United States*, 437 U.S. 1, 8 (1978).

matter of law, support a § 7212(a) obstruction conviction, the court's instructing the jury that these means could support such a conviction was reversible error.[15]

For purposes of argument, we will assume but not conclude that Sorensen can satisfy the first and second prongs of the plain-error standard. *See Wood*, 384 F. App'x at 708 (concluding that Wood had made a "plausible argument for the first two components of plain error review" for an instruction "allow[ing] the jury to find that [his] failure to file income tax returns" could suffice to violate § 7212(a)'s requirements). Even so, as in *Wood*, we conclude that Sorensen cannot establish plain-error's third prong.

"Satisfying the third prong of plain-error review—that the error affects substantial rights—usually means that the error must have affected the outcome of the district court proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (quoting *United States v. Cotton*, 535 U.S. 625, 632 (2002)). In other words, Sorensen bears the burden of proving that there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (alteration in original). Thus, on plain error review, "the *Yates* impossible-to-tell-warrants-reversal standard does not apply." *Wood*, 384 F. App'x at 709. Instead, we apply the substantial-rights test and consider the

---

[15] In our view, this substantially overstates the effect of the district court's unanimity instruction. Contrary to Sorensen's suggestion, it does not say that upon a jury's unanimously agreeing that the government had proved a listed means it must find him guilty of violating § 7212(a). Instead, it sets that as one condition of conviction. As revealed by reading the rest of the instructions, the jury still had to find each of the actual § 7212(a) elements beyond a reasonable doubt. Nothing about the unanimity instruction changed that.

38

strength of the government's case. *Id.* (citing *United States v. Draper*, 553 F.3d 174, 182 (2d Cir. 2009)).

Here, we are comfortable that the outcome of the trial would have remained the same even without the jury instruction and the fifth and sixth listed means of the indictment. The government presented strong evidence supporting the other four listed means[16]: (1) Sorensen created, with FFA's assistance, a number of pure trusts that were "used as vehicles to help disguise Sorensen's" income and assets; (2) he worked with and paid Sugar to create and maintain the Northside Management account to hold the money in the name of his pure trusts, and he purposely opened it without connecting his Social Security number to it; (3) he set up the Northside Management account with himself as the administrative assistant and Sugar as the trustee, paying Sugar to make bank transactions for Northside Management on his behalf; and (4) he acted as if the pure trusts "owned assets that he actually controlled, including his personal residence, his cars, the building where he conducted his dental practice, and the equipment used by that practice" and deposited dental income in the trusts to create the appearance that the payments were legitimate deductions, thereby reducing his taxable income. Appellant's App. vol. IV at 1031–33. Additionally, the government never suggested that the jury should convict Sorensen based on underreporting income or failing to file his tax returns by themselves. *Cf. Wood*, 384 F. App'x at 710 (finding no substantial prejudice when

---

[16] By using this language, we do not intend to announce a requirement that the government must prove a single means. That issue was not briefed, so we decline to reach it now.

"there is no indication that the prosecution described Mr. Wood's failure to file as an essential component of the § 7212(a) charge").

*iv.    Cumulative effect*

Sorensen asks that if we do not find that any one of the instructions requires reversal on its own, that we reverse his conviction based on the cumulative effect of all the erroneous instructions. Because the one error in the jury instructions favored him (that the district court should not have given a unanimity instruction), we cannot find cumulative effect.

**C. Surrebuttal Evidence**

Sorensen argues that the district court erred by refusing to allow him surrebuttal testimony. Surrebuttal evidence is "merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony." *United States v. Murray*, 736 F.3d 652, 657 (2d Cir. 2013); *see also United States v. King*, 879 F.2d 137, 138 (4th Cir. 1989). We defer to the district court for matters concerning the order and presentation of evidence. *See Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir. 1987). Whether to allow surrebuttal evidence is committed to the district court's sound discretion. *See United States v. Herring*, 582 F.2d 535, 543 (10th Cir. 1978). This court will not disturb a district court's evidentiary decision "absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Watson*, 766 F.3d 1219, 1234 (10th Cir. 2014). The district

court denied Sorensen's opportunity for surrebuttal, instead allowing him to present the same evidence in his case-in-chief.

Before trial, Sorensen voluntarily participated in three pre-indictment proffer sessions with the government. Present at all three sessions were Agent Hagemann and Sorensen's former attorney, Leonard Chesler. At trial, Sorensen testified, and on cross-examination denied that he had made certain statements to Agent Hagemann during the proffers. After Sorensen testified, the government proposed to call Agent Hagemann in rebuttal to counter some of Sorensen's testimony, but before the court ruled, defense counsel told the court that it then planned to call Chesler in surrebuttal to counter that expected testimony. The court denied defense counsel's request, explaining, "I'm going to give the Government the last word here, and I am not going to get into this scenario where there's surrebuttal and then sur-surrebuttal." Appellant's App. vol. IV at 855. The court also told defense counsel it would allow Chesler to testify in its case-in-chief, but that the court would not give the "last word" to the defense because it did not have the burden of proof. Appellant's App. vol. IV at 855. Defense counsel responded that it was his "instinct" not to call Chesler in the defense's case-in-chief, even though Chesler was in the courtroom and available to testify. Appellant's App. vol. IV at 854–55. The district court again denied the defense's request to call Chesler in surrebuttal. In protest, defense counsel explained that Chesler's testimony would be premature before rebuttal, but the court still refused. After rebuttal, defense counsel again explained why Chesler's testimony was necessary to refute Agent Hagemann's recollections of Sorensen's statements made in the proffers, but the court again declined. From this, we see the argument as one about the

41

timing of Sorensen's evidence, not about its exclusion. The court said that Sorensen could present his evidence—just not in surrebuttal: "You understand, I'm willing to let you put on Mr. Chesler in your case in chief to testify as to recollection of the statements made by Dr. Sorensen in your case in chief. So I'm not precluding you from putting that testimony on now."[17] Appellant's App. vol. IV at 856.

Sorensen argues that the district court committed legal error by concluding that the prosecution was entitled to the last word and that the denial of surrebuttal violated his Sixth Amendment rights. The government disagrees. It is common practice for the party with the burden of proof to proceed first and last. *See, e.g.*, Fed. R. App. P. 28(c) (permitting the appellant to file a reply brief, with no further briefing without the court's permission). The district court did not declare that it lacked the authority to allow surrebuttal. Rather, it said it did not want to get into a back-and-forth between the parties. The government characterizes the dispute as a procedural issue, and one within the district court's domain. We agree. *See Herring*, 582 F.2d at 543 (stating that whether to allow surrebuttal evidence is committed to the district court's sound discretion).

---

[17] Sorensen argues that Chesler's testimony would have been inadmissible before surrebuttal under Fed. R. Evid. 801(d)(1)(B). We reject this for two reasons. First, the district court's quote clearly demonstrates its willingness to hear Chesler's testimony. Second, Sorensen never raised this specific argument before the district court and has not asked for plain error review on appeal. Where a defendant pursues a new legal theory on appeal, we "usually hold it forfeited." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011); *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Therefore, we consider this argument waived.

Moreover, in response to defense counsel's request that he keep Chesler on call because "the Court can never tell what the last word is until the last word is spoken," the court permitted it. Appellant's App. vol. IV at 855. This demonstrates that the court left open the possibility for surrebuttal if it became necessary after it heard the rebuttal testimony. That the court later denied surrebuttal after hearing the rebuttal testimony strongly suggests it found the surrebuttal testimony unnecessary. Sorensen points to no evidence that the district court would have continued to forbid surrebuttal had it thought the testimony necessary.[18]

Sorensen next argues that Chesler's testimony was proper surrebuttal because it was in response to rebuttal testimony that raised a new issue broadening the government's case. He relies heavily on *Murray*, 736 F.3d at 653–54, in which the Second Circuit reversed a conviction for improper denial of surrebuttal. There, to rebut the defendant's cross-examination testimony regarding the number of times the defendant had been to a certain location, the government introduced cell-phone records suggesting the defendant had been there frequently. *Id.* at 655–56. The defendant unsuccessfully sought surrebuttal to explain his presence in the area, an issue which had not been raised until rebuttal. *Id.* at 656. On appeal, the Second Circuit rejected the government's argument that the defendant had a "full opportunity to put forth any evidence of his presence" during his defense case because this "misperceives the point in the trial at which the issue became pertinent." *Id.* at 658. The court explained that the defendant had no reason to know,

---

[18] Sorensen submits *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986), to support his argument. But *Van Arsdall* deals with cross-examination, not surrebuttal, so it offers little guidance.

before rebuttal, that the frequency of his presence in the area would become an issue in the trial. *Id.* Sorensen argues that his case looks like *Murray* because his defense counsel had no reason to call Chesler before the prosecution's rebuttal case. The government contends that Sorensen's proposed surrebuttal testimony was not appropriate because the government had not raised any new issues on rebuttal. The government distinguishes *Murray* because, unlike in that case, the government here did not raise new issues during rebuttal.

We agree with the government's position. Chesler was available to testify during Sorensen's case-in-chief, but defense counsel declined to call him then as a witness based on "instinct." Appellant's App. vol. IV at 854–56. As the government puts it, "[t]his was a tactical decision the defense must live with." Appellee's Br. at 38. Additionally, this case differs markedly from *Murray* because here it was highly foreseeable—even likely—that the government would call Agent Hagemann to testify on rebuttal after Sorensen had denied making certain statements to Agent Hagemann. The district court did not abuse its discretion in ruling as it did.

### D. Closing-Rebuttal Argument

Sorensen next complains that the prosecution's closing rebuttal argument misstated the evidence to mount an unfounded attack on Sorensen's credibility. He contends that the prosecutor's rebuttal theme—that Sorensen had left out or provided wrong information to Dr. Cogan during their pre-trial interview—grossly misstated what Sorensen had and had not said to Dr. Cogan. He alleges that the prosecutor's

44

misstatements prejudiced him by damaging his credibility in a case that turned on his credibility.

The prosecution may not misstate the evidence during its closing argument. *United States v. Young*, 470 U.S. 1, 9 & n.7 (1985). If the prosecutor does so, and the defense objects to the misstatement, we review de novo whether prosecutorial misconduct occurred. *United States v. Taylor*, 514 F.3d 1092, 1097 (10th Cir. 2008). If the defense failed to object at trial, we review for plain error. *United States v. Orr*, 692 F.3d 1079, 1098 (10th Cir. 2012). Here, Sorensen objected to some of the prosecutor's alleged misstatements, but not to others, so we will deal with each group of statements separately.

*Issue preserved for appeal.* Sorensen objected to the prosecutor's statement during rebuttal-closing argument that "despite what [Sorensen] told you, and despite what he told Special Agent Hagemann[,]" Sorensen told Dr. Cogan that "there were no warning signs, whatsoever, with respect to FFA, until 2009." Appellant's App. vol. IV at 1017–18; Appellant's Br. at 35. In fact, Dr. Cogan had testified that Sorensen had told him that there were no warning signs "for the first seven years maybe," Appellant's App. vol. IV at 822–23, and that Sorensen had told him that he had become "concern[ed]" when agents executed a search warrant at Sugar's office. Appellant's App. vol. IV at 825. Sorensen found out about the search warrant in August 2007. Thus, the government's arithmetic was two years off, likely beginning the "seven years" from 2000 when Sorensen first found and began setting course with FFA.

After Sorensen objected, the court instructed the jury that "to the extent that your collective memory disagrees with that of any lawyer, rely on your collective memory." Appellant's App. vol. IV at 1018. We conclude that this instruction cured any possible prejudice. *See Harris v. Poppell*, 411 F.3d 1189, 1197 (10th Cir. 2005) (finding that any cautionary steps such as instructions to the jury to counteract improper remarks must be considered in evaluating harm) (citing *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002)). Sorensen provides no evidence that the jury disregarded this comment, and "[j]urors are presumed to follow the judge's instructions." *United States v. Templeman*, 481 F.3d 1263, 1266 (10th Cir. 2007).

*Alleged errors not preserved below.* Sorensen challenges three additional alleged misstatements in the prosecutor's rebuttal-closing argument. Because he did not challenge these below, we review them for plain error. *See United States v. Rosales-Miranda*, 755 F.3d 1253, 1257 (10th Cir. 2014). The first statement is that "[Sorensen] didn't tell Dr. Cogan about the fact that there had been a search warrant at Melissa Sugar's office, or at least that that caused him some concern." Appellant's App. vol. IV at 1018; Appellant's Br. at 35. The government now concedes that Dr. Cogan in fact testified that Sorensen had told him about the search warrant and that the search warrant had concerned him. Thus, the prosecutor's statement was incorrect. But we agree with the government that this misstatement did not affect Sorensen's substantial rights.

Because of the strength of the evidence the government correctly summarized in closing, we do not believe that the prosecutor's minor misstatements were "flagrant

46

enough to influence the jury to convict on grounds other than the evidence presented." *United States v. LaVallee*, 439 F.3d 670, 696 (10th Cir. 2006) (quoting *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001)). Further, we note that the district court instructed the jury that the lawyer's statements and arguments are not evidence. *See United States v. Rogers*, 556 F.3d 1130, 1141 (10th Cir. 2009) (concluding that the prosecutor's improper remarks in closing argument did not affect defendant's substantial rights, in part because the district court had instructed the jury that closing arguments are not evidence).

In view of the entire record, we agree with the government that "[s]uch an errant remark can hardly justify overturning the jury's verdict." Appellee's Br. at 45–46. The court has "often held that a stray improper remark in closing is no basis for upsetting a trial and requiring the parties and the district court to redo their ordeal." *United States v. Lopez-Medina*, 596 F.3d 716, 740 (10th Cir. 2010) (quoting *Whittenburg v. Werner Enters., Inc.*, 561 F.3d 1122, 1131 (10th Cir. 2009)). Although we do not understand Sorensen to claim prosecutorial misconduct, we note that even "[p]rosecutorial misconduct is considered harmless 'unless there is reason to believe it influenced the jury's verdict.'" *United States v. Green*, 435 F.3d 1265, 1268 (10th Cir. 2006) (quoting *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996)). Here, we are confident that this relatively minor misstatement neither affected Sorensen's substantial rights nor the outcome of his case. *See Anaya*, 727 F.3d at 1056 (concluding that the prosecutor's improper statements did not rise to the level of plain error because it did not affect the defendant's substantial rights).

47

Next, Sorensen challenges the prosecutor's statement in closing-rebuttal argument that "[Sorensen] didn't tell [Dr. Cogan] anything about the over two million dollars in taxes that he and his son saved . . . ." Appellant's App. vol. IV at 1018; Appellant's Br. at 35. In fact, Dr. Cogan testified that Sorensen "said [the tax savings were] a large amount, but didn't give me a number." Appellant's App. vol. IV at 824. We find it debatable whether the government even misstated Dr. Cogan's testimony. It can credibly argue that Sorensen did not fully tell Dr. Cogan about the amount of tax savings—"a large amount" is not the same as "over two million dollars." Yet we can understand Sorensen's view that the prosecutor's statement might be interpreted to mean Sorensen had not disclosed to Dr. Cogan that he had saved any taxes. That we end up parsing the words might explain why Sorensen did not object at trial. In any event, we conclude that Sorensen fails to meet the stringent requirements of the plain-error standard.

Finally, Sorensen challenges the prosecutor's statement that "[Sorensen] didn't tell [Dr. Cogan] that he had never filed any tax returns, either for Northside [Management] or for any of the trusts." Appellant's App. vol. IV at 1018. Contrary to Sorensen's argument, Dr. Cogan's testimony at trial did in fact support the government's statement. Appellant's App. vol. IV at 824. Even so, Sorensen still disputes the accuracy of the government's statement, reasoning that "Dr. Cogan indisputably had been provided and had 'reviewed the Complaint' (indictment)[,]" Appellant's Br. at 35, which stated that Sorensen had not filed any tax returns for Northside Management or the pure trusts. But this focuses on the wrong question.

48

The appropriate inquiry here is whether the prosecutor misstated that Sorensen failed to *tell* Dr. Cogan about the lack of filed tax returns. Sorensen did not tell Dr. Cogan about it in their interview, so the prosecutor did not misstate the evidence.

*Mistrial.* During rebuttal-closing argument, the prosecutor said that the trial evidence showed that "Sorensen has been engaged in manipulation to try to hide what he has been doing" beginning in 2000, when he set up the trusts, through 2008, when he failed to file returns for the Northside Management account, and it urged the jury not to "let yourselves get manipulated." Appellant's App. vol. IV at 1019. After the government's closing-rebuttal argument, defense counsel sought a mistrial because the prosecutor's "theme" that Sorensen had withheld information from and manipulated Dr. Cogan was "over the top." Appellant's App. vol. IV at 1046, 1047. The district court told counsel "there were more than a few instances where one could take issue with what the jury was told" but "the instruction is adequate and I don't think it warrants or merits a mistrial." Appellant's App. vol. IV at 1048.

We review a district court's denial of a mistrial for abuse of discretion. *United States v. Serrato*, 742 F.3d 461, 464 (10th Cir. 2014). Here, Sorensen failed to brief us on his basis for claiming that the district court's denial of the mistrial was wrong. Federal Rule of Appellate Procedure 28(a)(8)(A) requires appellants to sufficiently raise all arguments and issues on which they wish the court to rule. An issue or argument that was insufficiently raised in the opening brief is deemed waived. *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) (citing *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277–78 (10th Cir. 1994)). By not making a single argument in

49

favor of his contention that the district court erred in denying the mistrial, Sorensen does not get the benefit of us making the argument for him. Therefore, we consider this argument waived.

### E. Cumulative Error

Finally, Sorensen argues that even if we find harmless each of his asserted errors, we should conclude that their combined effect resulted in a fundamentally unfair trial and requires reversal. The purpose of cumulative error analysis is to address whether the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Harlow*, 444 F.3d 1255, 1269 (10th Cir. 2006) (quoting *United States v. Rosario Fuentez*, 231 F.3d 700, 709 (10th Cir. 2000)). If we find multiple errors, we "aggregate all the errors that we found to be harmless and determine 'whether their cumulative effect on the outcome of the trial' mandates reversal." *Anaya*, 727 F.3d at 1060–61 (quoting *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990)).

The government argues that Sorensen's reference to the cumulative-error doctrine is merely "conclusory." Appellee's Br. at 50. A party asserting a claim is required to support that claim with argument and appropriate authorities. *United States v. Hardwell*, 80 F.3d 1471, 1492 (10th Cir. 1996). Thus, the government contends that Sorensen has waived his cumulative error argument. We agree that Sorensen does not cite any pertinent authority to support his assertion that there was cumulative error. Thus, we agree that he has waived this argument.

But even if he had briefed the issue sufficiently, we would still hold that there is no cumulative error. We found only two possible errors—the prosecutor's misstatements in closing argument and the jury instruction on "means." Based on our reasoning above, we hold that these two errors do not, cumulatively, amount to reversible error.

## III.    CONCLUSION

In sum, we conclude that Sorensen's arguments lack merit. Accordingly, we affirm his conviction.